UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

TIMOTHY E. STOUGH,                          :
        Plaintiff                          :
                                           :
        v.                                 :    CIVIL NO. 1:12-CV-2545
                                           :
CONDUCTIVE TECHNOLOGIES,                    :
INC.,                                       :
        Defendant.                         :
                                           :

M E M O R A N D U M

I.      Introduction

        Plaintiff, Timothy Stough, filed this disability discrimination suit on

December 19, 2012, alleging that Defendant, Conductive Technologies, Inc.

("Conductive"), demoted him and failed to promote him because he has Parkinson's

disease.  (Doc. 1).  On April 4, 2013, this case was stayed pending resolution of

Plaintiff's state workers' compensation claim against Defendant.  (Doc. 15).  The stay

was lifted in October 2013, and the parties were allowed six months to complete

discovery.  (Doc. 19).  Discovery ended on February 27, 2014.  (Doc. 19).  That same

day, Plaintiff filed a motion seeking to extend the discovery period by sixty days, claiming

that extreme winter weather had prevented Plaintiff's counsel from scheduling

depositions.  (Doc. 25).  We denied that motion on March 3, 2014, finding that Plaintiff

had failed to exercise reasonable diligence to complete discovery during the time

allotted.  (Doc. 27).  On March 10, 2014, Defendant filed a motion for summary

judgment, arguing that some of Plaintiff's claims are time-barred, and the rest fail as a

matter of law.  (Doc. 28).  On April 3, 2014, Plaintiff filed a second motion seeking to extend the discovery period, (Doc. 31), which we also denied.  (Doc. 35).  Defendant's motion for summary judgment is now ripe.  For the reasons stated herein, we will grant the motion.

II.        *Background*

### A. Plaintiff's Employment History at Conductive

Conductive is a designer, developer, and manufacturer of electrochemical biosensors and printed electronics.  (Doc. 30, ¶ 1; Doc. 38, ¶ 1).  Plaintiff began employment at Conductive in 1980.  (Doc. 30, ¶ 2; Doc. 38, ¶ 2).  In the late 1990's, Plaintiff was promoted to Printing Manager.  (Doc. 30, ¶ 6; Doc. 38, ¶ 6).  As Printing Manager, Plaintiff was responsible for coordinating production and supervising personnel in the Printing Department.  (Doc. 30, ¶¶ 6-7; Doc. 38, ¶¶ 6-7).  In March 2007, Plaintiff was diagnosed with Parkinson's disease.  (Doc. 30, ¶ 15; Doc. 38, ¶ 15).   Plaintiff notified his supervisors about the diagnosis shortly thereafter.  (Doc. 30, ¶ 16; Doc. 38, ¶ 16).

In September 2009, Conductive discovered that Plaintiff had been having an extramarital affair with one of the employees he supervised.  (Doc. 30, ¶ 21; Doc. 38, ¶ 21).  Plaintiff was given a written warning, suspended for ten days, and instructed to cease contact with the employee.[1]  (Doc. 30, ¶ 23; Doc. 38, ¶ 23).  Jessica Elder,

_____

1.  While both parties agree that Plaintiff was disciplined in this manner, and both agree that the discipline was related to the affair, Plaintiff maintains that Conductive's actions

Conductive's Human Resources Manager, recommended terminating Plaintiff's employment.[2]  (Doc. 30, ¶ 24; Doc. 38, ¶ 24).  Matthew Musho, Conductive's President, did not wish to fire Plaintiff, and instead moved him to a non-supervisory position.  (Doc. 30, ¶ 28; Doc. 38, ¶ 28).  Plaintiff's salary and benefits remained the same, but his duties were shifted from production to research and development.  (Doc. 30, ¶¶ 27, 109; Doc. 38, ¶¶ 27, 109).  Although other employees at Conductive engaged in romantic relationships and were not disciplined as Plaintiff was, none of these individuals began their relationships while one partner was directly supervising the other.[3]  (Doc. 30, ¶ 90; Doc. 38, ¶ 90).

        In 2010, Plaintiff's performance was rated "Meets Expectations."  (Doc. 30, ¶ 106; Doc. 38, ¶ 106).  Plaintiff testified at his deposition that he should have been rated "Outstanding," and that he believed he was being discriminated against on account of the affair.  (Doc. 30, ¶¶ 105-106; Doc. 38, ¶¶ 105-106).

_____

were chiefly motivated by discrimination in connection with his Parkinson's disease. (Doc. 38-1 at 26).

2.  Plaintiff denies several of Defendant's factual contentions, including this one, but routinely fails to identify record evidence that contradicts Defendant's assertions. Accordingly, these facts will be deemed admitted.  See Local Rule 56.1; FED. R. CIV. P. 56(e)(2).

3.  Plaintiff denies this fact and claims that the record conflicts on this issue.  (Doc. 38, ¶ 90).  We have reviewed the record, and it does not conflict.  Plaintiff admitted in his deposition that he is aware of only one supervisor-supervisee relationship, but that relationship preceded the individuals' employment at Conductive.  (Doc. 38-1 at 128-132).  Musho, Elder, and Loughran all testified that they are unaware of any other individual at Conductive who initiated a sexual relationship with a direct subordinate, as Plaintiff did.  (Doc. 30-5, ¶ 9; Doc. 30-2, ¶ 6; Doc. 30-1, ¶ 8).

In 2011, Conductive's Vice President of Manufacturing, Michael Loughran, retired.  (Doc. 30, ¶ 34; Doc. 38, ¶ 34).  Rather than replace Loughran, Conductive created a new position called Vice President of Operations, and in April 2011, Musho selected Tom Loyd, an internal candidate, to fill this vacancy.  (Doc. 30, ¶¶ 34, 39; Doc. 38, ¶¶ 34, 39).  Loyd had been working for Conductive for approximately one year, and had twenty years of prior experience as an executive at a large international company.  (Doc. 30, ¶¶ 40-42; Doc. 38, ¶¶ 40-42).  The Vice President of Operations position was not advertised, applications were not solicited, and Plaintiff was never a candidate for the position.  (Doc. 30, ¶¶ 38, 46; Doc. 38, ¶¶ 38, 46).  Musho believed that Plaintiff's affair showed a lack of good judgment, and that he did not possess the requisite technological skills to perform the job well.  (Doc. 30, ¶¶ 47-48; Doc. 38, ¶¶ 47-48).  According to Musho, Plaintiff's Parkinson's disease did not factor into his decision to hire Tom Loyd.  (Doc. 30, ¶ 52; Doc. 38, ¶ 52).  However, Stough testified at his deposition that on the morning Loughran announced his retirement, Musho called Plaintiff into his office and gave Plaintiff a booklet on Parkinson's disease.  (Doc. 30, ¶ 124; Doc. 38, ¶ 124).  The booklet has never been produced.  (Doc. 30, ¶ 129; Doc. 38, ¶ 129).

In October 2011, Plaintiff complained to Joseph Bevilacqua, Conductive's Controller, about his experiences at the company and expressed his intention to seek early retirement.  (Doc. 30, ¶¶ 53-58; Doc. 38, ¶¶ 53-58).  Plaintiff also emailed Bevilacqua, Elder, Musho, Loyd, and former-president Jerry Anderson, complaining that he was being harassed because of the affair.  (Doc. 30, ¶¶ 60-61; Doc. 38, ¶¶ 60-61).  A

4

few weeks later, Plaintiff met with Bevilacqua, Elder, Musho, and Loyd to address these complaints.  (Doc. 30, ¶ 63; Doc. 38, ¶ 63).  In February 2012, Plaintiff emailed Loyd again, stating that he was "being pressured . . . to go down roads [he would] rather not have to travel[,]" and asked to meet to discuss his options.[4]  (Doc. 30, ¶ 70; Doc. 38, ¶ 70).  On February 29, 2012, Musho offered Plaintiff a retirement package that included $75,000 in severance pay and continued provision of medical benefits for three years. (Doc. 30, ¶ 72; Doc. 38, ¶ 72).  Plaintiff rejected the offer.  (Doc. 30, ¶ 72; Doc. 38, ¶ 72).

On March 12, 2012, Plaintiff filed a charge with the EEOC.  (Doc. 1, ¶ 11). Two days later, Loyd reprimanded Plaintiff for missing a meeting with a supplier.[5]  (Doc. 30, ¶¶ 74-75; Doc. 38, ¶¶ 74-75).  In an email, Plaintiff explained that his absence was health-related, and indicated that he felt harassed.  (Doc. 30, ¶ 76; Doc. 38, ¶ 76).

In August 2012, Elder sent Plaintiff a letter explaining that he had used the majority of his Family Medical Leave Act ("FMLA") time, and asking that his physician complete a questionnaire to determine if he required additional leave.[6]  (Doc. 30, ¶ 79; Doc. 38, ¶ 79).  Plaintiff responded, calling the request "obstructive and improper[,]" and instructing Elder to direct further questions to his counsel.  (Doc. 30, ¶ 80; Doc. 38, ¶ 80).

---

4.  Plaintiff denies this fact "as stated" and claims that the "record speaks for itself[,]" but fails to cite any portion of the record that contradicts this assertion.  See Doc. 38, ¶ 70.

5.  Plaintiff denies this fact but fails to properly support the denial.

6.  Again, Plaintiff denies this fact but fails to properly support the denial.

Ultimately, Plaintiff's physician completed the form and Plaintiff was provided with additional leave.  (Doc. 30, ¶ 82; Doc. 38, ¶ 82).

In November 2012, Plaintiff sent a memorandum to Musho explaining that he needed to be placed on long-term disability, and requesting severance pay totaling $227,000, continued provision of his health and life insurance, and payment of his attorney's fees.  (Doc. 30, ¶¶ 83-84, Doc. 38, ¶¶ 83-84).  Plaintiff stopped working in December 2012 and continued to receive a salary until April 2013.  (Doc. 30, ¶ 85; Doc. 38, ¶ 85).  After his salary stopped, he began receiving long-term Social Security disability benefits.  (Doc. 30, ¶ 86; Doc. 38, ¶ 86).

*B.  Additional Facts Supporting Plaintiff's Hostile Work Environment Claim*

Plaintiff testified that Jerry Anderson once commented that his "[n]ew position [was] not so bad considering [his] condition and all and no decrease in salary." (Doc. 30, ¶ 103; Doc. 38, ¶ 103).  Plaintiff also testified that even after this comment, he still believed Anderson "had [his] back."  (Doc. 30, ¶ 104; Doc. 38, ¶ 104).

Plaintiff testified that he was "treated like an idiot" by Quality Control Supervisor Leslie Shreiner.  (Doc. 30, ¶ 135; Doc. 38,  ¶ 135).  According to Plaintiff, many employees complained about Shreiner, and she was generally regarded as a "very nasty supervisor."  (Doc. 30, ¶¶ 136-137; Doc. 38, ¶¶ 136-137).

Last, Plaintiff claims that a co-worker told him that other employees were talking about him during meetings.  (Doc. 30, ¶ 140; Doc. 38, ¶ 140).  According to

Plaintiff, these employees called him a "trouble maker" who "always points out the negative" and "always brings up the obstacles involved."  (Doc. 30, ¶ 140; Doc. 38, ¶ 140).

III.        *Discussion*

    *A.  Standard of Review*

We will examine the motion for summary judgment under the well-established standard.  <u>Lawrence v. City of Philadelphia</u>, 527 F.3d 299, 310 (3d. Cir. 2008) ("Summary judgment is only appropriate if there are no genuine issues of material fact.").  We "must view all evidence and draw all inferences in the light most favorable to the non-moving party" and we will only grant the motion "if no reasonable juror could find for the non-movant."  <u>Id.</u>  "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party.'"  <u>Roth v. Norfalco</u>, 651 F.3d 367, 373 (3d Cir. 2011) (citing <u>Lamont v. New Jersey</u>, 637 F.3d 177, 181 (3d Cir. 2011)).

    *B.  Plaintiff's Demotion and Failure to Promote Claims*

Plaintiff claims that Defendant demoted him to Production Engineer and refused to promote him to Vice President of Operations because he has Parkinson's disease.  Defendant argues that both of these claims are time-barred.  In response,

Plaintiff asserts that the two events were part of a continuing violation, and therefore the claims are timely.

In order to state a claim under the ADA, a plaintiff must file a charge with the EEOC within 300 days of the alleged discriminatory action.  See 42 U.S.C. § 2000e-5(e)(1).  Plaintiff was demoted to Production Engineer in September 2009, and was passed over for the promotion to Vice President of Operations in April 2011.  Plaintiff waited until March 12, 2012 to file a charge with the EEOC (Doc. 1, ¶ 11), so any claims based on events that occurred before May 17, 2011 are time-barred.  Both the demotion and the failure to promote claims fall outside this time-frame.  However, Plaintiff argues that the claims survive because the continuing violation theory applies.

"Under the continuing violation theory a plaintiff may pursue a time-barred claim for discriminatory conduct if [he] can show that the act is part of an 'ongoing practice or pattern of discrimination.'"  Rogan v. Giant Eagle, Inc., 113 F. Supp. 2d 777, 784 (W.D. Pa. 2000).  To succeed under this theory, Plaintiff must demonstrate that:  (1) at least one discriminatory act occurred within the filing period (in this case, after May 17, 2011); and (2) the harassment was more than isolated or sporadic acts of intentional discrimination.  Id.  The key inquiry is whether the conduct complained of would have alerted Plaintiff that he should assert his rights and file a charge with the EEOC within 300 days.  Id.  "Thus, the theory is seldom applicable where the discriminatory act is a failure to hire, promote, or train."  Id.  This is because "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify.

8

Each incident of discrimination . . . constitutes a separate actionable 'unlawful employment practice.'" Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002); see also Kepple v. GPU, Inc., 2 F. Supp. 2d 730, 743 (W.D. Pa. 1998) (rejecting continuing violation theory because demotion was a discrete incident); Miller v. Cohen, 52 F. Supp. 2d 389, 400 (M.D. Pa. 1998) (finding failure to promote was sufficient to trigger plaintiff's awareness of her rights)).

Following this precedent, we must conclude that Plaintiff's demotion and failure to promote claims are based on discrete acts, and were not part of a continuing violation.  Plaintiff states that when he was demoted, he was moved to a "'non-production office' because he was no longer supervising personnel[,]" and this "gave Plaintiff an uncertain position at the company," where he had been working for 29 years.  (Doc. 37 at 12).  Similarly, Plaintiff claims that his interest in the Vice President of Operations promotion was well-known, and that Loyd "was far less qualified than Plaintiff . . . ." (Doc. 37 at 13; Doc. 1, ¶ 29).  If Plaintiff wished to pursue disability discrimination claims based on these events, he should have filed a charge with the EEOC within 300 days of their occurrence.  Because Plaintiff failed to do so, his demotion and failure to promote claims are time-barred.  We will grant summary judgment in favor of Defendant on these claims.

### C.  Hostile Work Environment Claim

Defendant also moves for summary judgment on Plaintiff's hostile work environment claim, arguing that it fails as a matter of law.  To succeed on this claim,

Plaintiff must demonstrate that (1) he has a disability; (2) he was subject to harassment; (3) the harassment was related to his disability; (4) the harassment was sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive work environment; and (5) Defendant knew or should have known of the harassment and failed to take prompt remedial action.  Walton v. Mental Health Ass'n of Se. Pa., 168 F.3d 661, 667 (3d Cir. 1999).  Defendant argues that Plaintiff fails to satisfy the third and fourth elements of this claim.  We agree.

The majority of the allegations supporting Plaintiff's hostile work environment claim are related to the way he was treated in the wake of his affair, and have no connection to his disability.  After Conductive discovered the affair, Plaintiff was reprimanded, suspended, and subsequently transferred to a non-supervisory position. Plaintiff has produced no record evidence demonstrating that these actions were related to his disability.  While other employees at Conductive have engaged in inter-office relationships, Defendant demonstrated that these individuals were not similarly situated to Plaintiff because they did not begin a relationship while one individual was directly supervising the other.  Plaintiff also complains about his substandard performance review, but nothing in the record indicates that the poor review was the product of discrimination.  Further, when Loyd reprimanded Plaintiff for missing a meeting with a supplier, he did not mention Plaintiff's health, and simply requested that Plaintiff call in to notify the company if he was going to be absent.  Although Plaintiff claims that he was treated poorly by Quality Control Supervisor Leslie Shreiner, according to Plaintiff's

testimony, Shreiner treated everyone poorly.   Last, Plaintiff complains that employees gossiped about him during meetings, but the alleged subject of this gossip was Plaintiff's attitude–not his health.

Plaintiff cites three instances of alleged harassment that were connected to his Parkinson's disease, but these events are neither pervasive nor severe, and cannot support a hostile work environment claim.  The first is the August 2012 letter that Elder sent to Plaintiff regarding FMLA leave.  Although Plaintiff claims that he felt the letter was inappropriate, as the Human Resources Manager, Elder's conduct was entirely appropriate and nothing in the record indicates that this letter was harassing or degrading.  The second and third instances of alleged harassment involve disputed facts. Plaintiff testified that in 2011, Musho gave him a booklet on Parkinson's disease, but that booklet has never been produced.  Additionally, Plaintiff testified that on an unspecified date, Jerry Anderson told Plaintiff that his new position was "not so bad" considering that he had Parkinson's disease.  Even construing these disputed facts in the light most favorable to Plaintiff, these two isolated incidents cannot form the basis of a hostile work environment claim.  To determine whether an environment is hostile, we examine whether the conduct is "physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1988).  "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Id. at 788.  None of

Plaintiff's allegations meets the standard for a hostile work environment.  Accordingly, we will grant summary judgment in favor of Defendant.

IV.        *Conclusion*

For the foregoing reasons, we find that Defendant is entitled to judgment as a matter of law.  An appropriate order follows.